IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| ALEXIS NOVICK, individually and as administrator of the ESTATE of RUTH ANN MENZ, deceased,    ) ) ) ) | |
| Plaintiff,    ) ) | |
| v.    ) ) | Case No. 22-cv-02259 |
| VILLAGE OF BOURBONNAIS, an Illinois municipal corporation, et al,    ) ) ) | |
| Defendants.    ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff Alexis Novick ("Plaintiff") brings this Complaint individually and as the administrator of the Estate of Ruth Ann Menz ("Ruth") pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and other related Illinois state laws for an incident that occurred on July 10, 2022. (Doc. 1). Before the Court is Defendant Village of Bourbonnais's (the "Village") and Defendants Chief Jim Phelps, Officer Garcia, Officer Cavander, Officer Bertrand[1], and John and Jane Does, unknown officers, agents, servants, or employees of the Bourbonnais Police Department (together, "Defendants") Partial Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1). (Doc. 17). For the reasons that follow, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

---

[1] Defendants Chief Phelps, Officer Garcia, Officer Cavander, and Officer Bertrand will hereinafter be referred to as the "Officer Defendants"

## I.      FACTUAL BACKGROUND

Prior to her untimely death, Ruth was a resident of the Village of Bourbonnais, Kankakee County, Illinois, and lived with her husband, Larry Menz, Jr. ("Larry"). (Doc. 1 at ¶ 4). Plaintiff is the only child of Ruth and Larry and is a resident of the State of Georgia. (*Id.* at ¶ 5). Plaintiff was appointed as the administrator of Ruth's Estate by order of the Circuit Court of the Twenty-First Judicial Circuit of Illinois on November 10, 2022. (*Id.*).

Ruth lived with Larry in a single-family home in the Village of Bourbonnais for 20 years. (the "Cherokee Drive house"). (*Id.* at ¶ 12). Larry's father, Larry Menz, Sr. ("Larry Sr."), owned and operated a towing company with Larry within the Village. (*Id.* at ¶¶ 13). The Menz's towing company had a contract with the Village and the Bourbonnais Police Department to provide towing services. (*Id.* at ¶ 14). Because of this association, Larry Sr., Larry, and the Bourbonnais Police Department maintained a professional and personal relationship. (*Id.* at ¶¶ 14-15). This familiarity extended to the Defendants' knowledge of the lengthy history of domestic disturbances and Larry's propensity for domestic violence against Ruth within the Cherokee Drive house. (*Id.*).

Defendant Village of Bourbonnais (the "Village") is an Illinois municipal corporation organized into various departments, including the Bourbonnais Police Department. (*Id.* at ¶¶ 6-11). At all relevant times, Defendant Phelps was employed by the Village as the Chief of the Bourbonnais Police Department. Officers Garcia, Cavander, and Bertrand were the responding officers to the domestic violence incident at Cherokee Drive house on July 10, 2022.

On August 26, 2019, Larry was charged by the Bourbonnais police with domestic battery of Ruth in Kankakee County Case No. 19 CM 711 ("Domestic 1"). (*Id*. at ¶ 16). As a result, a criminal order of protection ("COP") was issued prohibiting Larry from living in or coming within 500 feet of Ruth or the Cherokee Drive house. (*Id*). While Domestic 1 was still pending, Larry was charged with domestic battery of Ruth in Kankakee County Case No. 21 CM 542 ("Domestic 2"). (*Id*. at ¶ 17). On July 10, 2022, both criminal cases were pending, and the COP was in full force and effect. (*Id*. at ¶ 18).

Plaintiff alleges that the officers in the Bourbonnais Police Department, including the Officer Defendants, were aware of the two pending criminal cases against Larry for domestic violence against Ruth, as well as the COP prohibiting any contact by Larry with Ruth or the Cherokee Drive house. (*Id*. at ¶ 19).

Between approximately 11:15 and 11:30 p.m. on July 10, 2022, Ruth's neighbor, Mahmoud Hijab ("Mahmoud"), heard loud screaming coming from outside the Cherokee Drive house and a woman begging for help. (*Id*. at ¶ 22). Mahmoud grabbed his gun and approached the Cherokee Drive house, recognizing Larry violently dragging a bloodied Ruth out of the front door by her face and neck (*Id*. at ¶ 23-27). In an attempt to help Ruth, Mahmoud yelled at Larry, who told Mahmoud it was none of his business. (*Id*.). Mahmoud called the police, relayed his observations, and specifically emphasized the violent nature of the altercation. (*Id*. at ¶¶ 29-30).

Officer Garcia of the Village of Bourbonnais Police Department arrived five minutes later and Officers Bertrand and Cavander arrived on scene shortly thereafter. (*Id*. at ¶ 31, 33, 34). Mahmoud informed all three Officers that Ruth was being violently

beaten, visibly seriously injured, and he believed Larry was going to kill her if there was not police intervention. (*Id*. at ¶ 32, 33).

Officer Garcia approached the Cherokee Drive house and attempted to communicate with Larry through a serious of questions, but Larry refused to communicate or cooperate with Officer Garcia and walked into the garage, closing the door behind him. (*Id*. at ¶¶ 35-36). The officers made multiple attempts to knock on Ruth's door, but Larry refused to answer and locked the doors to the house. (*Id*. at ¶ 37). Officers Garcia, Bertrand, and Cavander discussed the situation with Chief Phelps via a telephone call. (*Id*. at ¶ 39). Instead of arresting Larry for violating the order of protection, Chief Phelps advised the Officers that it was the policy and/or prudent course of action to contact Larry Sr. and seek his help to handle this type of situation. (*Id*.).

The Officers called and spoke to Larry Sr. while they were still at the home. (*Id*. at ¶¶ 41-45). Larry Sr. told the officers he would "handle it." (*Id*.). Upon receiving this information, Chief Phelps instructed the Officers to leave the scene. (*Id*. at ¶ 48). Prior to leaving the scene, the Officers told Mahmoud they did not have probable cause to enter the Cherokee Drive house. (*Id*. at ¶ 49). While still at the home, one of the officers stated that they would "call off and wait for tomorrow and pray to God he doesn't do anything." (*Id*. at ¶ 46).

The next morning, on July 11, 2022, the Officers arrived at the Cherokee Drive house with a SWAT team. (*Id*. at ¶ 52). Ruth was found dead inside the house, murdered by Larry, who subsequently committed suicide. (*Id*. at ¶¶ 51-53). After the bodies were

discovered, Chief Phelps made a public statement that the situation was handled in accordance with proper Village policy. (*Id*. at ¶ 54).

On November 29, 2022, Plaintiff filed the instant Complaint alleging the following claims against Defendants: Count I – Section 1983 Civil Rights Claim; Count II – Failure to Intervene; Count III – *Monell* Custom Policy and Practice; Count IV – Indemnification, brought pursuant to state law; Count V – Gross Negligence/Recklessness, brought pursuant to state law; Count VI – Willful and Wanton Conduct, brought pursuant to state law; Count VII – Wrongful Death, brought pursuant to the Illinois Wrongful Death Act; Count VIII – Violation of the Illinois Domestic Violence Act; Count IX – Violation of Due Process; Count X – Violation of Equal Protection; and Count XI – Survival Act, brought pursuant to state law. (*See* Doc. 1 at ¶¶ 56-138).

On January 30, 2023, Defendants filed their Partial Motion to Dismiss Counts I, II, III, IX, and X of the Complaint, pursuant to Rule 12(b)(6), on the basis that these counts fail to state claim upon which relief may be granted. (Doc. 17). Defendants assert the non-enforcement of an order of protection is not a constitutional violation and the Officers have no duty to prevent criminal conduct of a non-state actor. (*Id*. at 4-7.) Defendants argue the *Monell* doctrine does not apply to Plaintiff's claim. (*Id*. at 7; 9-13)

On February 28, 2023, Plaintiff filed her Response to Defendants' Partial Motion to Dismiss. (Doc. 19). Plaintiff argues Defendants had a statutorily created duty to act, in part due to the danger enhanced by Officer Defendants' conduct which "shock the conscience." (*Id*. at 2; 6; 9). Plaintiff maintains the factual allegations outlined in the

Complaint sufficiently allege that Defendant Chief was the final policymaker who established the common policy or practice that led to Ruth's death. (*Id*. at 13-15).

## II.     LEGAL STANDARD

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). To state a claim for relief, a plaintiff need only provide a short and plain statement of the claim showing she is entitled to relief and giving the defendants fair notice of the claims. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [his] favor." *Id*. A plausible claim is one that alleges factual content from which the court can reasonably infer that the defendants are liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Merely reciting the elements of a cause of action or supporting claims with conclusory statements is insufficient to state a cause of action. *Id*.

## III.    ANALYSIS

In their Partial Motion to Dismiss, Defendants move for the dismissal of Counts I, II, III, IX, and X of the Complaint, pursuant to Rule 12(b)(6)[2].

---

[2] Defendant's Partial Motion to Dismiss moves for the dismissal of Count II: Failure to Intervene. (Doc. 17 at 7-8). However, at oral argument on the Motion held on August 15, 2023, Plaintiff withdrew Count II. The Court accepted Plaintiff's withdrawal of this Count and, accordingly, dismissed Count II. (*See* 8/15/2023 Minute Entry #SP-1, 1:48:13).

**A.  Due Process Claims Under 42 U.S.C. § 1983**

In its Partial Motion to Dismiss, Defendants argue for dismissal of Counts I and IX arguing the Due Process Clause does not impose a duty on the State to protect against injuries inflicted by private individuals. (Doc. 17 at 4-5).

**1.  Substantive Due Process**

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dept. of Social Servs.*, 489 U.S. 189, 197 (1989). The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. *Id*. at 195. It forbids the State from depriving individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. *Id*.

Courts have recognized two exceptions to *DeShaney's* rule that state actors have no constitutional duty to protect people from each other: the "special relationship" exception and the "state-created danger" exception. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015). Plaintiff alleges the "stated-created danger" exception applies to this case. (*See* Doc 1. ¶¶ 22-50; Doc. 21 at 7-9). The second exception to the general rule that a State does not violate a person's substantive due process rights by failing to protect that person from private violence applies "when a state actor's conduct creates, or substantially contributes to the creation of, a danger or renders citizens more

vulnerable to a danger that they otherwise would have been." *E. Porter Cnty. Sch. Corp.*, 799 F.3d at 798 (internal quotation marks omitted). This exception is a narrow one. *Hernandez v. City of Goshen, Ind.*, 324 F.3d 535, 538 (7th Cir. 2003).

To state a claim under the "state-created danger" exception, a plaintiff must allege that "(1) defendants, by their affirmative acts, created or increased a danger to the plaintiff; (2) defendants' failure to protect the plaintiff from that danger proximately caused plaintiff's injuries; and (3) defendants' failure to protect the plaintiff 'shocks the conscience.'" *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015). The first requirement—that State action created or increased a danger to the plaintiff—"must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect." *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008); *see also id.* ("If all that were required was a causal relation between inaction and harm, the rule of DeShaney would be undone . . . .").

In order to increase a risk of private violence so as to be liable to the victim for her injuries, the State must do something to transform "a potential danger into an actual one," rather than just standing by and doing nothing to prevent private violence. *Sandage*, 548 F.3d at 600. In determining whether a danger has been created or increased, the two relevant questions are: (1) what affirmative acts did the State take, and (2) what dangers would the plaintiff have faced had the State not taken those actions. *Wallace v. Adkins*, 115 F.3d 427, 430 (7th Cir. 1997). The second inquiry requires a comparison of the danger the plaintiff faced after the State's affirmative acts with the danger the plaintiff faced before those acts were taken, not with the danger that the plaintiff would have faced had the

State done what the plaintiff expected it to do. *Id*. The third requirement of the "state-created danger" exception—that the State's failure to protect the plaintiff "shocks the conscience"—is "an attempt to quantify the rare 'most egregious official conduct' required for substantive due process liability." *Flint*, 791 F.3d at 770.

In this case, Plaintiff argues Ruth was put in a worse position due to police intervention. (Doc. 19 at 6-9). Plaintiff uses the term "intervention" not in the sense that the Officers intervened in the situation between Ruth and Larry, but that the Officers intervened in Mahmoud's potential intervention. (*Id*.). Plaintiff argues that "Mahmoud was prepared to intervene and go after Larry Menz with his gun, but chose to let the police handle it." (*Id*. at 7). Plaintiff argues the exception applies because "[h]ad the police not handled it, Mahmoud could have actively intervened and saved Ruth." (Doc. 19 at 7). Plaintiff also asserts that the Officers' act of knocking on the Cherokee Drive house door created a danger in that "Larry likely would have felt that the police were going to enter soon." (*Id*.).

The only case cited by Plaintiff to support this argument is a decision by the California Northern District Court. (Doc. 19 at 8). In *Mackie v. Cnty. of Santa Cruz*, 444 F. Supp. 3d 1094, 1106 (N.D. Cal. 2020), plaintiff and her neighbor defendant had prior interactions where the police were called to a neighborhood disturbance. On the day that plaintiff was shot, a police officer was called and confronted the defendant and, as plaintiff alleged, caused defendant to become violent and shoot at plaintiff after the officer had left. *Id*. at 1102. In denying a motion to dismiss, the *Mackie* court found it plausible that the police officer's actions left the defendant in an agitated state and

thereby increased plaintiff's exposure "to an actual and particularized danger." *Id*. at 1105. This decision lacks binding authority over this Court. Furthermore, in contrast to the Plaintiff in this case, the *Mackie* plaintiff survived the shooting incident, affording her the chance to plead a more factually detailed claim regarding how the officer created a dangerous situation while at the plaintiff's residence. *Id*. at 1102.

Indeed, as Defendants point out in their Reply, Plaintiff's argument is hard to read as anything more than a request for judicial approval of vigilantism. (Doc. 21 at 7). As the Seventh Circuit has cautioned, the "state-created danger" exception to *DeShaney* is a narrow one. *Hernandez*, 324 F.3d at 538. To "'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect and thus circumvent *DeShaney's* general rule." *Sandage*, 548 F.3d at 599 (citation and emphasis omitted). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id*. at 600. The Officers' conduct in this situation (knocking on the door, calling Larry Sr., and then leaving) does not amount to creating or increasing a danger. *Sandage*, 548 F.3d at 599. Rather, these actions are reasonably viewed as ones where the Officers "stood by and did nothing to prevent private violence." *Id*. at 600.

Plaintiff argues, albeit very briefly and in the alternative, that Ruth was put in a worse position because Defendants' prior conduct (calling Larry Sr. instead of arresting Larry for violating the COP) effectively allowed Larry to know that the police would not enforce the COP. (Doc. 19 at 9). Plaintiff cites *White v. Rochford*, 592 F.2d 381, 385-86 (7th

Cir. 1979) for the assertion that Defendants' past actions of calling Larry Sr. put Ruth into a worse situation on the night in question. (Doc. 19 at 9). However, *Rochford* is factually distinguishable. The Seventh Circuit has, in fact, rejected Plaintiff's argument in cases more akin to this matter. In *Wilson-Trattner v. Campbell*, 863 F.3d 589 (7th Cir. 2017), the court denied the plaintiff's substantive due process claim because there was no indication that the defendant officers did anything to embolden her former boyfriend, a sheriff's deputy, or otherwise indicate that he could abuse her with immunity. The court found the contention that the officers' "dismissive and indifferent attitudes" to a series of incidents "endangered [the victim] by progressively emboldening" the assailant is "squarely foreclosed by *DeShaney*." *Id*. at 594 (*citing Deshaney*, 489 U.S. at 197).

Accordingly, the allegations in Count I regarding Defendants' conduct are insufficient to invoke the state-created danger exception to the general rule set forth by the Supreme Court in *Deshaney* – that a State does not violate a person's substantive due process rights by failing to protect that person from private violence. *E. Porter Cnty. Sch. Corp.*, 799 F.3d at 798. The case law in the Seventh Circuit is steadfast that standing by and doing nothing is not a state-created danger. *Sandage*, 548 F.3d at 600. The Court dismisses the Substantive Due Process claim contained in Count I of the Complaint.

### 2.  Procedural Due Process

"An essential component of a procedural due process claim is a protected property or liberty interest." *Domka v. Portage County, Wisconsin*, 523 F.3d 776, 779 (7th Cir. 2008). In the context of a procedural due process claim, state law governs whether something is

"property" afforded procedural due process while federal law determines the process that is required. *Goros v. County of Cook*, 489 F.3d 857, 859 (7th Cir. 2007).

In *Deshaney*, a mother brought an action against a county pursuant to § 1983 on behalf of a child who was severely abused by his father. 489 U.S. at 189. The mother alleged the county was aware of the danger imposed by the father but did not act to prevent the abuse of the child and, ultimately, the child's death. *Id*. The Court concluded that a State's failure to protect an individual citizen against private violence "simply does not constitute a violation of the Due Process Clause." *Id*. at 197. It is important to note that the Supreme Court analyzed only the plaintiff's substantive due process rights in the context of state protection from private violence. *See Id*. at 195 ("The claim is one invoking the substantive rather than the procedural component of the Due Process Clause . . . .").

The Supreme Court decided a similar issue in *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748 (2005) but this time, analyzed the procedural due process component. In *Castle Rock*, a mother had a permanent restraining order against her estranged husband requiring him to stay 100 yards away from the family home at all times, except during pre-arranged visits. *Id*. at 752. Of important note, the critical language in the restraining order came not from any part of the order itself, but from the preprinted notice to law-enforcement personnel that appeared on the back of the order. *Id*. at 758. That notice effectively restated the Colorado statutory provision describing "peace officers' duties" related to the crime of violation of a restraining order. The preprinted text on the back of the form included the following "**WARNING**":

"**A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME** . . . . A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. **YOU MAY BE ARRESTED** WITHOUT NOTICE IF A LAW ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER."

*Id*. at 751-52. (emphasis in the original).

The preprinted text on the back of the form also included a "**NOTICE TO LAW ENFORCEMENT OFFICIALS,**" which read in part:

"YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER."

*Id*. (emphasis in the original). While the permanent restraining order was in force, the husband abducted the children from the family home. *Id*. at 753. The wife repeatedly asked law enforcers to search for and arrest the husband pursuant to the restraining order, but the police told her to wait until later that evening. *Id*. That same night, the husband murdered all three children. *Id*. at 754. The mother filed suit alleging the police department violated her rights under the Due Process Clause by refusing to enforce the restraining order. *Id*.

The Supreme Court noted that "the procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a

property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id*. at 755. (*quoting Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). These entitlements are, "'of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Id*. (*quoting Paul v. Davis*, 424 U.S. 693, 709 (1976)).

Importantly, the Supreme Court reiterated its past holdings that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. *Id*. In examining the language in the restraining order's notice, the Court noted that the Colorado statute's text, namely, "shall use every reasonable means to enforce a restraining order" did not make "enforcement of restraining orders *mandatory*." *Id*. at 760-61). (emphasis in original). The Supreme Court held the Colorado law had not created a personal entitlement to the enforcement of restraining orders such that the State law made enforcement of the restraining order mandatory, as opposed to giving discretion to the police officer. *Id*. at 760. The Court further noted there is a practical necessity for discretion that is "particularly apparent in a case such as this, where the suspected violator is not actually present and his whereabouts are unknown." *Id*.

Defendants cite *Castle Rock* for the proposition that a law enforcement officer's decision not to enforce a restraining order does rise to the level of a violation of the Due Process Clause. (Doc. 17 at 5-6). However, the statutory language in *Castle Rock* is distinguishable from the language in the present case.

In *Castle Rock*, the Supreme Court found that the state statute did not grant plaintiff a property interest in the enforcement of her restraining order because it did not mandate police enforcement of restraining orders. 545 U.S. 760. Indeed, the Court noted "a true mandate of police action *would require some stronger indication* from the Colorado Legislature than 'shall use every reasonable means to enforce a restraining order.'" 545 U.S. at 761 (emphasis added). In reaching its decision, the Supreme Court placed great weight on the fact that the alleged perpetrator was not at the scene when police arrived. *Id*. at 762. The Supreme Court noted that the practical necessity for discretion is particularly apparent in a case such as that one, where the suspected violator is not actually present and his whereabouts are unknown. *Id*. In so holding, the Court echoed a Court of Appeals of Washington decision, noting "[t]here is a vast difference between a mandatory duty to arrest [a violator who is on the scene] and a mandatory duty to conduct a follow up investigation [to locate an absent violator]. . . . A mandatory duty to investigate would be completely open-ended as to priority, duration and intensity." *Id*. (*quoting Donaldson v. Seattle*, 65 Wash. App. 661, 671-672, (1992). Essentially, the Supreme Court concluded there was no statutory right established in that scenario due to the greater ambiguity in the options available to police officers when the perpetrator was not on the scene. *See Castle Rock*, 545 U.S. at 761-65.

In this case, the relevant Illinois statute provides:

> "Whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer **shall immediately use all reasonable means** to prevent further abuse, neglect, or exploitation, including:

(1) Arresting the abusing, neglecting and exploiting party, where appropriate;

(2) If there is probable cause to believe that particular weapons were used to commit the incident of abuse, subject to constitutional limitations, seizing and taking inventory of the weapons;

(3) Accompanying the victim of abuse, neglect, or exploitation to his or her place of residence for a reasonable period of time to remove necessary personal belongings and possessions;

(4) Offering the victim of abuse, neglect, or exploitation immediate and adequate information (written in a language appropriate for the victim or in Braille or communicated in appropriate sign language), which shall include a summary of the procedures and relief available to victims of abuse under subsection (c) of Section 217 and the officer's name and badge number;

(5) Providing the victim with one referral to an accessible service agency;

(6) Advising the victim of abuse about seeking medical attention and preserving evidence (specifically including photographs of injury or damage and damaged clothing or other property); and

(7) Providing or arranging accessible transportation for the victim of abuse (and, at the victim's request, any minors or dependents in the victim's care) to a medical facility for treatment of injuries or to a nearby place of shelter or safety; or, after the close of court business hours, providing or arranging for transportation for the victim (and, at the victim's request, any minors or dependents in the victim's care) to the nearest available circuit judge or associate judge so the victim may file a petition for an emergency order of protection under subsection (c) of Section 217. When a victim of abuse chooses to leave the scene of the offense, it shall be presumed that it is in the best interests of any minors or dependents in the victim's care to remain with the victim or a person designated by the victim, rather than to remain with the abusing party.

750 ILCS 60/304(a) (emphasis added).

The instructive language in the Illinois Domestic Violence Act is mostly analogous to the operative language in the Colorado statute at issue in *Castle Rock* in regard to a law enforcement officers' duties, with exception of one word: immediately. *Compare* 750 Ill. Comp. Stat. 60/304(a) ("…the officer **shall immediately use** all reasonable means to prevent further abuse, neglect, or exploitation . . . .") (emphasis added) *with* Colo. Rev. Stat. § 18-6-803.5(3)(a) ("A peace officer **shall use** every reasonable means to enforce a restraining order.") (emphasis added).

In analyzing the legislative intent of the Illinois Domestic Violence Act, the Illinois Supreme Court has held the Act provides "a comprehensive statutory scheme for reform of the legal system's historically inadequate response to domestic violence." *Moore v. Green*, 219 Ill. 2d 470, 488-89 (2006). It begins with the directive that the Act "shall be liberally construed and applied to promote its underlying purposes." *Id.* at 480 (*citing* 750 ILCS 60/102 (West 2018)). It then provides a statement of those underlying purposes, which include: recognizing that domestic violence is a serious crime; supporting the efforts of victims of domestic violence to prevent further abuse; clarifying the responsibilities and supporting the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence, recognizing that officers often become the secondary victims in domestic violence incidents; and expanding civil and criminal remedies for victims of domestic violence. *Id.* at 481 (*citing generally* 750 ILCS 60/102(1), (4), (5), (6) (West 2018)).

Furthermore, section 304 of the Illinois Domestic Violence Act delineates the obligations of law enforcement officers in providing assistance to victims of domestic violence like Ruth. 750 ILCS 60/304 (West 2018) (emphasis added). Section 304(a) requires law enforcement officers to take **immediate** action if they suspect abuse by a family or household member, including arresting the abuser and ensuring the victim's safety and medical care. 750 ILCS 60/304(a) (emphasis added). Thus, as affirmed in *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 322-24 (1995), Section 304 establishes an immediate duty to act when a law enforcement officer has reason to believe that a person has been abused by a family member.

In crafting the language of the Illinois Domestic Violence Act, the Illinois legislature structured the Act in a manner such that officers are mandated to "immediately" employ all reasonable measures to halt abuse. *See* 750 ILCS 60/304(a). In liberally construing the Act to promote its underlying purposes, the Court finds that the combination of the presence of the perpetrator at the scene, coupled with the statutory language "shall immediately," creates a requirement to act. By employing the term "immediately" within the context of the statute when the offender is present, the legislature employed emphatic language to indicate that there is no discretion when abuse is occurring and is mandated to intervene to stop the abuse. While the officer may exercise discretion regarding whether or not to make an arrest, the immediate duty to intervene and halt the ongoing abuse is obligatory under the Act. *See id.*

The Officer Defendants' decision not to arrest Larry did not diminish their obligations under the Act, which unequivocally required them to immediately intervene,

cease Larry's actions, and ensure his removal from the Cherokee Drive house and Ruth's presence. *See id*. This did not occur, as evidenced by the outcome of the night in question. Additionally, Plaintiff alleges Defendants knew of Ruth's status as an individual requiring protection under the Illinois Domestic Violence Act. (Doc. 1 at ¶ 16; ¶ 19; ¶ 40, ¶ 49; ¶ 64; ¶ 83). Defendants were also aware of the existence of the order of protection, which was obtained due to Larry's actions, and which prohibited Larry from having any contact with Ruth or entering the Cherokee Drive house. (*See id*.). Circumstances further underscore the mandatory nature of the duty to effect an arrest. Larry had absolutely no legal right to be at the Cherokee Drive house or within 500 feet of Ruth. (*Id*. at ¶ 16). Ruth had secured an order of protection through the legal system, which affirmed her entitlement to protection, in addition to the statutory right. (*See id*.; 750 ILCS 60/304(a)). However, she was deprived of both rights on the night in question.

Even in cases where an arrest is not executed, the Act obligates law enforcement officers to take immediate alternative actions *See* 750 ILCS 60/304(a). It is also clear from the outcome of the night in question that the Officers did not take any of the mandated statutory actions. To comply with the provisions outlined in section 60/304(a), the Officer Defendants were compelled to intervene and halt Larry's actions, even in the absence of an arrest. The legislature crafted the statute to require officers to take immediate and reasonable actions to stop abuse, emphasizing this obligation with clear and mandatory language. In reviewing the Act, the Court is satisfied that the Illinois legislature's chosen language is in accord with the *Castle Rock* precedent regarding a "stronger indication" of mandatory language." *Castle Rock*, 545 U.S. at 750 ("a true mandate of police action would

require some stronger indication than the Colorado statute's direction to "use every reasonable means to enforce a restraining order" or even to "arrest . . . or . . . seek a warrant."). The utilization of unequivocal and obligatory language compels the conclusion that the State has instituted a protected liberty interest. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 455 (1989) (a state creates a protected liberty interest by placing substantive limitations on official discretion).

Accordingly, considering the Illinois legislature's intent in drafting the Illinois Domestic Violence Act, the Court finds the allegations in Count I of the Complaint to sufficiently allege a cognizable claim under 42 U.S.C. § 1983 based on procedural due process grounds.

### B.  Violation of Equal Protection

Defendants move for dismissal of Plaintiff's equal protection claim in Count III of the Complaint. (Doc. 17 at 6-7). Specifically, Defendants argue Plaintiff has failed to state a facially plausible equal protection claim that Ruth was a member of a protected class, nor has she alleged that other female victims of domestic violence were treated similarly or differently than Ruth was allegedly treated. (*Id.*).

Upon elaboration in the Response, Plaintiff states she is bringing a class-of-one equal protection claim. (Doc. 19 at 11-12). Specifically, Plaintiff argues that but for Larry Sr. having a business relationship with Defendants and the Village, the Officers would have enforced the COP, thus creating a class-of-one. (*Id.*; *citing* Doc. 1 at ¶¶ 123-131).

With the clarification of the Response, Defendants move to dismiss in that, to the extent Plaintiff claims Defendants violated her equal protection rights on the night in

question, the claim must fail because (1) class-of-one claims cannot be based on discretionary action by the government, and (2) even if Ruth's treatment differed, there was a rational basis for the disparate treatment in this case. (Doc. 21 at 13-25).

The Supreme Court has recognized that a plaintiff may bring an equal protection claim alleging she has suffered discrimination as a "class of one"—that is, regardless of her membership in any recognized protected class. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). To survive a motion to dismiss on a class-of-one claim, a plaintiff must allege she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685-86 (7th Cir. 2013) (*quoting Village of Willowbrook*, 528 U.S. at 564).

Additionally, in class-of-one claims challenging the government's execution of alleged discretionary functions, plaintiffs must ordinarily point to evidence that individuals similarly situated to themselves received different treatment; in most cases, this is necessary to "distinguish between unfortunate mistakes and actionable, deliberate discrimination." *See Geinosky v. City of Chi.*, 675 F.3d 743, 747-48 (7th Cir. 2012). As the court in *Geinosky* explained, however, there are circumstances where comparators are unnecessary—instances of official misconduct whose deviation from the benign application of discretion is readily apparent standing alone. *Id.* at 748. In *Geinosky*, the court found that where a plaintiff had received 24 dubious parking tickets over a two-year period, requiring him to point to other citizens with similar driving habits who had not been so treated would be both unrealistic and unhelpful. *Id.*

Defendants argue Plaintiff fails to allege she was intentionally treated differently from others similarly situated. (Doc. 21 at 14-15). However, like the plaintiff in *Geinosky*, requiring Plaintiff to name similarly situated domestic violence victims, protected by a COP, whose responding law enforcement officers arrived at the scene and elected *not* to place a phone call to the restrained abuser's father would hardly help in distinguishing between ordinary wrongful acts and deliberately discriminatory denials of equal protection. *Geinosky*, 675 F.3d at 748.

Defendants also argue that, even if the alleged statutory discretion of the Act does not bar her claim, Plaintiff's equal protection claim does not overcome the rational basis test. (Doc. 21 at 13-14). Specifically, Defendants argue the Officer Defendants "acted plenty rationally in exercising their judgment to refrain from raising the temperature on the advice of the assailant's family member." (*Id*. at 14). The Court is unpersuaded that Defendants' procedure and/or custom of calling Larry Sr. in all complaints of domestic violence by Larry, (Doc. 1 at ¶ 74), so as not to "raise the temperature" of the assailant, (Doc. 21 at 14) is a rational exercise of discretion. This was not a situation where neighbors were concerned because they may have overheard raised voices. The Officer Defendants knew Ruth had a criminal order of protection against Larry for two pending domestic violence cases and a neighbor personally observed Larry drag a seriously injured Ruth into her house by her face and neck while screaming for help. The facts alleged in the Complaint do not amount to a rational exercise of discretion. This alleged procedure and/or custom of calling an assailant's father to "handle the situation" more akin to selective withdrawal of police protection, which the Seventh Circuit has found to be the

"prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). Accordingly, the Court finds the allegations in Count X of the Complaint sufficiently state a class-of-one equal protection claim.

### C. *Monell*

Defendants seek dismissal on the ground that Plaintiff has failed to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978); (Doc. 17 at 9-14). Section 1983 "creates a private right of action against any 'person' who violates [a] plaintiff's federal rights while acting under color of state law." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (*citing* 42 U.S.C. § 1983). While the Supreme Court held in *Monell* that municipalities are "person[s]" who may be sued under § 1983, it "added an important caveat: Municipalities are not vicariously liable for the constitutional torts of their employees or agents." *Id.* (*citing Monell*, 436 U.S. at 691–94). Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694

There are several elements of a *Monell* claim, all of which must be met. First, a § 1983 plaintiff "must always show 'that he was deprived of a federal right.'" *Dean*, 18 F.4th at 235 (*quoting First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). Second, the plaintiff must "trace the deprivation to some municipal action (i.e., a 'policy or custom'), such that the challenged conduct is 'properly attributable to the municipality itself.'" *Id.* (*quoting LaPorta*, 988 F.3d at 986). Third, the

plaintiff must show that the municipal action was the "moving force behind the federal-rights violation . . . . This rigorous causation standard requires a direct causal link between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *Id.* (*quoting LaPorta*, 988 F.3d at 986 (internal quotation marks omitted)).

In their Partial Motion to Dismiss, Defendants contend Plaintiff's *Monell* claim fails to satisfy the first two elements of the *Monell* test. (Doc. 17 at 9-14). Specifically, Defendants argue there is no underlying constitutional violation at its core, and the Complaint fails to trace the alleged constitutional violation to some municipal policy or custom such that the conduct is properly attributable to the municipality itself. (*Id.*). As the Court has already found an underlying constitutional violation in both Plaintiff's Procedural Due Process claim and Equal Protection claim, the Court's analysis moves into the second element under a *Monell* claim.

There are three types of municipal action, under the second element, that may give rise to liability under § 1983: "'(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Dean*, 18 F.4th at 235 (*quoting LaPorta*, 988 F.3d at 986).

### 1. Express Policy

Defendants assert that Plaintiff has failed to allege, and cannot allege, with factual specificity that an express policy and/or practice was implemented because no such

express policy and/or practice existed. (Doc. 17 at 9-14). Plaintiff contends that Chief Phelps's public statement, in which he stated that the Village and Officers acted in accordance with proper policies and procedures, constitutes an admission that the actions taken on the night in question were in line with an express policy. (Doc. 19 at 13-14; Doc. 1 at ¶ 54).

To pursue a *Monell* express policy theory, a plaintiff must identify a policy and point to specific language in it that "explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). There are two varieties of "express policy" claims under *Monell*. The first applies, "as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Id*. (*citing Monell*, 436 U.S. at 658). To prevail on this first variation, Plaintiff must identify specific language in the policy that explicitly violates a person's constitutional rights. *Id*. at 381. "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id*. at 379-80 (*citing City of Okl. v. Tuttle,* 471 U.S. 808, 822 (1985)). The second variation of an "express policy" claim applies where the plaintiff "object[s] to omissions in the policy," i.e., that the policy fails to address certain issues. *Id*. at 380. An "'implicit policy' claim is not another variation of an 'express policy' claim but rather is another name for a claim brought under a 'widespread practice' theory." *Alcorn v. City of Chicago*, 2018 U.S. Dist. LEXIS 126034, at *16 (N.D. Ill. July 27, 2018) (*citing Calhoun*, 408 F.3d at 381 (describing plaintiff's claim as alleging an "implicit theory reflected in an alleged widespread practice")).

Here, Plaintiff is unable to point to a specific written policy to support the existence of an express policy. (Doc. 14 at 14). Instead, Plaintiff argues Chief Phelps's public statement that what happened at the Cherokee Drive house was in "accordance with proper policies and procedures" is evidence of an express policy. (Doc. 14 at 14). The Court finds this is more akin to an "implicit policy" which would need to be brought under the widespread custom theory, as opposed to an express policy claim.

### 2. Widespread Practice

Defendants assert that one instance of a behavior is insufficient to demonstrate a widespread custom or practice. (Doc. 17 at 11-12). Defendants cite a slew of Seventh Circuit precedent for this proposition, including *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014); *Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981); and *Helbachs Cafe LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022). (Doc. 17 at 11-12). Those cases are not on point. *Wilson*, *Powe*, and *Helbachs* each dealt with appeals of summary judgment, rather than motions to dismiss, and hence fail to help the Court arrive at a decision.

"[T]here is no blanket rule that *Monell* plaintiffs must always allege multiple instances of unconstitutional conduct in order to show that a policy exists." *Jackson v. Vill. of Justice*, No. 17-cv-07739, 2020 U.S. Dist. LEXIS 55697, at *13 (N.D. Ill. Mar. 31, 2020). The Seventh Circuit considered this issue in *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), where the plaintiff simply alleged he had been arrested on an inadequately supported warrant "in accordance with a widespread practice of the police department of the City of Chicago." The district court's dismissal of the *Monell* claim was held to be an error, and the Court ruled: "White was not required to identify every other or even

one other individual" who had been the victim of the alleged constitutional violation. *Id.* at 844. That is because courts may not apply a "heightened pleading standard" to *Monell* claims. *Id.* Since *White*, many district courts "have declined to grant motions to dismiss that are premised on the argument that the complaint does not contain allegations beyond those relating to the plaintiff." *Mack*, 2020 WL 7027649, *5 (collecting cases); *see also Brown v. Bryant*, No. 15 C 10445, 2018 U.S. Dist. LEXIS 80890, at *4 (N.D. Ill. May 14, 2018) ("Although Plaintiff has not alleged any other specific instances where the policy or practice caused constitutional violations, he need not do so in order to survive a motion to dismiss."). That said, there must be some context "creating an inference of a widespread policy or custom." *Hutton v. City of Chicago*, 2021 U.S. Dist. LEXIS 39783, at *9-10 (N.D. Ill. Mar. 3, 2021).

In this case, Plaintiff argues the pleadings sufficiently establish there was a widespread practice to allow Larry Sr. to resolve the disputes between his son and Ruth, based on the allegation that there were at least three incidents where Larry Sr. was called to resolve the incidents between Ruth and Larry. (Doc. 19 at 14-15). Additionally, Plaintiff contends that, based on Chief Phelps's public statement, there "could be ten, it could be a hundred, it could be a thousand" similar situations where other cases with the same facts are handled the same way. (*Id.*). District courts within the Seventh Circuit have found a press statement may be used as evidence of a widespread policy. *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 894 (N.D. Ill. 2016). In *Spearman*, the Northern District of Illinois found a Plaintiff's allegations that a "code of silence" existed among Chicago Police Department officers was sufficiently demonstrated through a press conference. *Id.*

In *Spearman*, the only allegation supporting an inference of the code of silence was Mayor Rahm Emanuel's December 2015 statement acknowledging the existence of a "code of silence" within the Chicago Police Department. *Id.* The court ruled the press statement was enough proof to support the existence of a widespread policy. *Id.*

As in *Spearman*, the press conference here did allude to the Officers following proper procedures. (Doc. 1 at ¶ 54). This press statement was given by Chief Phelps with full knowledge of the events taking place at the Cherokee Drive house. (*Id.*) The press conference, coupled with the repeated incidents and calls to Larry Sr., can be considered evidence of a widespread policy. Indeed, post-*White* court's analyzing *Monell* claims similarly have "scotched motions to dismiss" premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff. *Stokes v. Ewing*, 2017 U.S. Dist. LEXIS 77489, 2017 WL 2224882, at *4 (N.D. Ill. May 22, 2017) (plaintiff's allegations that he was falsely arrested pursuant to a "custom, practice, and policy" that "promoted illegal arrests of innocent individuals" sufficient to survive a motion to dismiss under *White*); *Kerlin v. Chicago Board of Elections*, 2017 U.S. Dist. LEXIS 50013, 2017 WL 1208520, at *6-7 (N.D. Ill. Apr. 3, 2017) (relying on *White* and denying motion to dismiss where plaintiffs identified a specific constitutional deprivation of their right to vote and alleged a "pervasive and widespread de facto policy, practice, and procedure of willfully disregarding citizens' right to vote"); *Zinn v. Village of Sauk Village*, 2017 U.S. Dist. LEXIS 28602, 2017 WL 783001 (N.D. Ill. Mar. 1, 2017) (holding that plaintiffs sufficiently pled a *Monell* claim under White where plaintiffs alleged that they suffered a constitutional deprivation "pursuant to [defendant village's] widespread practice of

illegally and unconstitutionally seizing private property" and charging monetary fees for its return).

To be clear, the Court does not opine on the likelihood of Plaintiff's success on the merits regarding her widespread policy argument. Instead, it merely concludes that at the current procedural posture, Plaintiff's Complaint satisfies the necessary pleading standards outlines in Fed. R. Civ. P. 8(a). While Defendants are correct that at summary judgment, a single allegation of unconstitutional conduct by a municipal employee cannot give rise to a *Monell* claim, (Doc. 17 at 11), we are not at the motion for summary judgment stage. As such, the Court may not apply such a heightened pleading standard to Plaintiff's widespread custom *Monell* claim. *White*, 829 F.3d at 844.

### 3. Final Policymaker Theory

"Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty.*, 183 F.3d 734, 737 (7th Cir. 1999). Consciously adopted courses of governmental action may be fairly attributed to a municipality when it is made by a municipal agency or official having final authority to establish and implement the relevant policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (policy decision of county prosecutor). Further, it has been noted that "a chief of police may be a final policymaker in appropriate circumstances. *Logan v. City of Evanston*, 2020 U.S. Dist. LEXIS 188625, at *16 (*citing Manos v. Caira*, 162 F. Supp. 2d 979, 993 (N.D. Ill. 2001)).

For instance, in *Logan*, the court ruled that the plaintiffs alleged sufficient facts to make it plausible that the police chief "retains complete authority over how criminal

investigations are conducted" and that he is therefore a "final policymaker." *Logan*, 2020 U.S. Dist. LEXIS 188625, at *16. In that case, the police chief had issued a statement himself which indicated that his actions occurred "during the course of a criminal investigation," which is "within the realm of the authority granted to the police chief." *Id.* at *17-18. As such, the court ruled that the defendants were not entitled to dismissal on that count. *Id.*

Defendants rely on *DiMaio v. Wexford Health Sources, Inc.*, 2021 WL 1056848, at *4 (N.D. Ill. Mar. 19, 2021) for the proposition that Plaintiff has not alleged sufficient evidence to demonstrate that Chief Phelps was a *de facto* policymaker for the Village. (Doc. 17 at 13). In *DiMaio*, the court began by noting that a *Monell* theory can succeed upon a showing of a deliberate act from a Sheriff's Office employee with final policy-making authority. *DiMaio*, 2021 WL 1056848, at *10. The court noted that plaintiff merely asserted a conclusory allegation that the county sheriff had actual or constructive knowledge of numerous complaints by pretrial detainees who were in the custody of the KCAJC. *Id.* Thus, it held that plaintiff did not allege enough to nudge his policymaker allegations across the line from conceivable to plausible. *Id.* Plaintiff argues that *DiMaio* is inapposite due to the public admission by Chief Phelps that the officers in the instant case acted in accordance with Village policy. (Doc. 19 at 15). Moreover, the Complaint alleges "Chief Phelps was, at all times relevant hereto, engaged in supervising and directing the police officers of the department and establishing, setting, disseminating and enforcing official policy for the Bourbonnais P. D. and the Village." (Doc. 1 at ¶ 7).

As in *Logan*, the press conference in this case supports the allegation that the police chief "retains complete authority over how criminal investigations are conducted" and

that he is therefore a "final policymaker." *Logan*, 2020 U.S. Dist. LEXIS 188625, at *16. It was alleged that as the police chief, Chief Phelps was engaged in supervising and directing the police officers. (Doc. 1 at ¶ 7). Additionally, the evidence suggests that the officers at the scene called Chief Phelps for direction on how to act, reinforcing the notion that he is the final policymaker. (Doc. 1 at ¶¶ 39-48). This case is, therefore, distinguishable from *DiMaio* because Plaintiff has alleged sufficient facts to make it plausible that Chief Phelps had policymaking authority as he instructed the Officers' course of action when they called him at the Cherokee Drive house. (Doc. 1 at ¶¶ 39-48).

At this stage, it is premature to conclusively determine whether Chief Phelps is in fact a final policymaker because the answer may turn on factual questions regarding the extent of his policymaking authority. Because that factual question is not one properly addressed on a motion to dismiss, the Court will not dismiss Plaintiff's *Monell* claim, premised on final policymaking authority, at this stage of the litigation.

In summary, Plaintiff need only plead the alleged incident is one of many occurring in the Village of Bourbonnais, and that a widespread practice and/or directive by Chief Phelps gave rise to those incidents. Plaintiff's Complaint satisfies this requirement. Accordingly, taking the allegations as true, the Court finds Plaintiff's *Monell* claim sufficient to clear the plausibility threshold required under Fed. R. Civ. P. 12(b)(6).

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 17) is GRANTED in part and DENIED in part. Defendants' Motion is GRANTED as to any substantive due process claim asserted in Count I and DENIED in all other respects. Pursuant to Rule

12(a)(4)(A) of the Federal Rules of Civil Procedure, Defendants have 14 days to file a response to Plaintiff's Complaint.


/s/ Colleen R. Lawless
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE

ENTER: September 29, 2023