E-FILED
Thursday, 24 September, 2026 09:20:42 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **ALEXIS NOVICK, individually and as Administrator of the ESTATE OF RUTH MENZ, deceased,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 22-cv-2259** |
| **VILLAGE OF BOURBONNAIS, JIM PHELPS, TRAVIS GARCIA, AARON CAVENDER, HENRY BERTRAND,** | ) | |
| **Defendants.** | ) | |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff Alexis Novick filed her Complaint individually and as the administrator of the Estate of Ruth Menz, asserting claims under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and related Illinois state laws following the murder of Ruth Menz by Larry Menz, Jr. Before the Court are Plaintiffs' Motion for Partial Summary Judgment on Liability as to Counts I, III, IV, V, VI, VIII, IX, and X. (Doc. 56) and Defendants' Motion for Summary Judgment. (Doc. 57). For the reasons that follow, Plaintiffs' Motion is DENIED and Defendants' Motion is GRANTED.

## I. FACTUAL BACKGROUND[1]

### A. The Parties

This case arises from the tragic murder of Ruth Menz ("Ruth") by her husband Larry Menz, Jr. ("Larry Jr.") on or about July 10, 2022, at their home in Bourbonnais, Illinois. Plaintiff Alexis Novick is the only child of Larry Jr. and Ruth. Plaintiff was appointed as the administrator of Ruth's Estate by order of the Circuit Court of the Twenty-First Judicial Circuit of Illinois on November 10, 2022. Defendant Village of Bourbonnais is an Illinois municipal corporation located in Kankakee County, Illinois and within the Central District of Illinois. Chief James Phelps, a Defendant, was an employee of the Village of Bourbonnais Police Department and was always acting within the course and scope of his employment and under color of law relevant to this case. At all relevant times, Defendants Sgt. Henry Bertrand, Officer Aaron Cavender, and Officer Travis Garcia were employees of the Village of Bourbonnais Police Department and acting within the course and scope of their employment and under color of law.

### B. Larry Menz, Jr. and Ruth Menz

Ruth was a resident of the Village of Bourbonnais, where she lived with her husband, Larry Jr., in a single-family home located at 730 Cherokee Drive for 20 years. (*Id.* at ¶ 7). On March 4, 2013, the Bourbonnais Police Department responded to a

---

[1] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded in each party's statement of material facts; the opposing party's response to the statements of material facts and any additional material facts; the replies to the other party's additional facts; and exhibits to the filings.

domestic battery call at the Menz residence, and Larry Jr. was charged with domestic battery against Ruth. (*Id.* at ¶ 8).

On November 26, 2014, Bourbonnais police officers were called to the Menz residence in reference to a violation of an order of protection. (*Id.* at ¶ 10). Larry Jr. entered the home and went into the bedroom where Ruth was sleeping, retrieved a handgun from the nightstand, and pointed it in her face while stating, "Next time I'll come back and you will be dead." (*Id.* at ¶ 11). Larry, Jr. walked out of the residence and left in an unknown vehicle. (*Id.* at ¶ 12). According to the police report, officers attempted to locate Larry Jr. but could not find him. (*Id.* at ¶ 13). On December 2, 2014, Larry Jr. turned himself into the police and he was charged with violation of an order of protection and aggravated assault. (*Id.* at ¶ 14).

On November 19, 2017, at 2:52 a.m., Bourbonnais Police Officers Domagalski and Fahrow responded to a domestic call for service involving Ruth and Larry, Jr. (*Id.* at ¶ 15). Ruth appeared intoxicated and Larry Jr. was not cooperative. (*Id.* at ¶ 16). The officers offered Ruth options going elsewhere when Larry Jr. did not cooperate, but Ruth did not want to leave so the officers left. (*Id.* at ¶ 17). No arrests were made. (*Id.* at ¶ 18). As the officers were driving away, they observed that Ruth sat down in the driveway. (*Id.* at ¶ 19). The officers soon returned to the residence due to the temperature outside to make sure Ruth got back inside. (*Id.* at ¶ 20). Officers Domagalski and Fahrow entered the Menz residence with Ruth because she asked them to walk her in, and Larry Jr. pulled out a shotgun. (*Id.* at ¶ 21). Officer Fahrow asked Larry Jr. multiple times to drop the shotgun, after which he was arrested. (*Id.* at ¶¶ 22-23). At 10:44 p.m., the officers returned to the

Menz residence for a follow-up visit with Ruth. (*Id.* at ¶ 25). They provided Ruth with information on the Illinois Domestic Violence Act and explained how to obtain an order of protection. (*Id.* at ¶ 26).

On November 19, 2017, Officer Fahrow filled out a Clear and Present Danger form against Larry, Jr.. (*Id.* at ¶ 24). On November 27, 2017, Patrolman Boudreau of the Bourbonnais Police Department met with Larry Jr. in reference to handing over a revoked FOID card. Larry Jr. advised that he received a letter from the Illinois State Police detailing a mandatory return of his FOID card. (*Id.* at ¶ 27).

On August 24, 2019, Larry Jr. called the police because Ruth battered him while she was intoxicated. Members of the Bourbonnais Police Department responded to the call. (*Id.* at ¶ 28). Larry Jr. did not have injuries, but Ruth did. (*Id.* at ¶ 29). Ruth refused to sign a complaint against Larry Jr. (*Id.* at ¶ 30). Bourbonnais police officers signed the complaint and took Larry Jr. into custody on domestic battery charges. (*Id.* at ¶¶ 31-32). On August 26, 2019, upon the State's motion, the Circuit Court of Kankakee County granted a Criminal Order of Protection against Larry, Jr., ordering him to stay at least 500 feet away from Ruth and/or their place of residence. (*Id.* at ¶¶ 33-34). On August 28, 2019, Ruth filed a petition for divorce against Larry Jr., which she dismissed on October 10, 2019, because "the parties have reconciled." (*Id.* at ¶ 35).

On August 11, 2021, Sgt. Suprenant of the Bourbonnais Police Department was dispatched to the Menz residence, where Ruth reported that Larry Jr. had physically abused her on July 3, 2021. (*Id.* at ¶¶ 36-37). Ruth signed a complaint for domestic battery and completed a Domestic Violence Fact sheet, an IDVA form, a Marsy's Rights form,

and a Danger Assessment form. (*Id.* at ¶¶ 38-39). Ruth reported that Larry Jr. did not own a gun, though Plaintiff alleges Ruth answered "yes" to 12 questions which indicated that Larry was a danger—including her belief that he was capable of killing her. (*Id.* at ¶ 40; Doc. 67, Resp. ¶ 40). Later that day, Ruth filed a Voluntary Statement Form with the Bourbonnais Police Department requesting the case against Larry Jr. be dismissed. (Doc. 57, ¶ 41). During the pendency of the case, Ruth requested multiple times for the State to dismiss both the 2019 and 2021 domestic battery cases against Larry Jr. but the State would not do so. (Doc. 57, ¶ 42). Ruth also requested that the State vacate the Criminal Order of Protection against Larry but the State refused. (*Id.* at ¶ 43).

On July 10, 2022, Larry Jr. and Ruth were living together at 730 Cherokee Drive. (*Id.* at ¶ 44). Ruth allowed Larry Jr. to live at the residence despite the fact there was an active Criminal Order of Protection preventing Larry Jr. from being within 500 feet of Ruth or living at the residence. (*Id.* at ¶ 45). Plaintiff alleges Ruth was trapped in the domestic abuse cycle and had a habit of kicking Larry Jr. out and letting him back into the house. (Doc. 67, Resp. ¶¶ 44-45).

**C. July 10-11, 2022 Incident**

On July 10, 2022, at 11:22 p.m., Mahmoud Hijab, who lived at 754 Cherokee Drive, called 911 and reported that he heard his neighbor yelling "help, help, help." (Doc. 57, ¶ 47). Officer Garcia was instructed by his supervisor to respond. (*Id.* at ¶ 48). The parties dispute whether Officer Garcia knew Ruth and Larry Jr. prior to July 10. (*Id.* at ¶ 49; Doc. 67, Resp. ¶ 49). At the very least, Officer Garcia was aware of their history of contact with law enforcement. (*Id.*) Officer Garcia arrived at the home at 11:24 p.m., approximately

two minutes after the 911 call. (Doc. 67, Resp. ¶ 50). Defendants allege that, when responding to the call, Officer Garcia was not aware there was an order of protection preventing Larry Jr. from being within 500 feet of Ruth or living at the residence. (Doc. 57, ¶ 51). In response, Plaintiff states that while it cannot conclusively determine whether Officer Garcia knew about the order of protection, he should have known about the order of protection. (Doc. 67, Resp. ¶ 51).

Officer Garcia was wearing a body camera on the night of July 10, 2022. (Doc. 57, ¶ 52). Upon arriving, Officer Garcia spoke to Mahmoud Hijab, who told the officer that he heard someone screaming for help and thought his neighbor was beating up his wife. (*Id.* at ¶¶ 53-54). At 11:26 p.m., Officer Garcia approached the house with an open garage door, and a man was inside the garage. Officer Garcia did not know Larry Jr. (*Id.* at ¶ 55). Officer Garcia asked the man who was later determined to be Larry Jr., "How's it going? Everything all good?" upon which Larry Jr. responded, "I'm fine." Officer Garcia replied, "Good? No problems?" and Larry Jr. said "No." Officer Garcia asked Larry Jr. if he was home alone and he said yes and closed the garage door. (*Id.* at ¶ 56). Officer Garcia's interaction with Larry Jr. before he closed the garage door and walked away lasted approximately nine seconds. (*Id.* at ¶ 57). Officer Garcia testified he did not believe there were exigent circumstances to follow Larry Jr. into the home or to enter the home. (*Id.* at ¶ 58). Plaintiffs contend Officer Garcia should have known there were exigent circumstances and immediately placed Larry Jr. handcuffs in order to further investigate. (Doc. 67, Resp. ¶ 58).

Larry Jr. went to the front door of the home, locked the front door, and then walked further into the home as Officer Garcia peered into the home through the side window. (Doc. 57, ¶ 59). Officer Garcia knocked on the front door of the home several times and looked through the living room window of the home. (*Id. at* ¶ 60). Officer Garcia testified he saw nothing that appeared out of the ordinary when he looked through the window. (*Id.* at ¶ 61). He further testified he did not see any signs of distress and did not hear anything. (*Id.* at ¶ 62). While acknowledging Officer Garcia's testimony about what he saw and heard, Plaintiffs allege Garcia's bodycam video shows what appears to be a basketball-sized dent in the drywall of the living room. (Doc. 67, Resp. ¶¶ 61-62).

Officer Cavender arrived at the scene at about 11:27 p.m. and spoke to Hijab, who told Cavender, "She was screaming. I know he was beating her up because she started yelling 'help, help.'" (Doc. 57, ¶¶ 63-65). Hijab also told the officer, "He was like pulling her from the hair." (*Id.* at ¶ 66). Sgt. Bertrand arrived at the scene around 11:32 p.m. (*Id.* at ¶ 67). Officer Garcia again knocked on the front door several times and shined his flashlight into the living room. (*Id.* at ¶ 68). Officer Garcia did not hear any screaming or gunshots while outside of the residence. (*Id.* at ¶ 69). Officer Garcia testified there was nothing he saw or heard that caused him to believe a female was in the house. (*Id.* at ¶ 70). Plaintiffs dispute this statement based on Hijab's statements to the officers. Furthermore, Officer Garcia could see there were two vehicles parked at the residence and Larry Sr. told the officers that Ruth was home. (Doc. 67, Resp. ¶ 70).

Defendants testified they did not believe there was probable cause to enter the residence by force or to seek a warrant for entry into the home. (Doc. 57, ¶ ¶ 71, 72). The

officers also told Hijab they did not have probable cause to enter the Menz residence. Hijab said he understood and acknowledged it was a hard decision for the police officers to make. (*Id.* at ¶ 73). Plaintiff acknowledges the officers' probable cause determinations but contends that circumstances showed there was in fact probable cause to enter the residence or seek out a search warrant. (Doc. 67, Resp. ¶¶ 71-73).

Chief Phelps testified he has never personally communicated with Larry Menz, Sr., regarding domestic violence incidents at the Menz residence. (Doc. 57, ¶ 74). Larry Sr. was never asked by the police to help intervene in an incident involving Larry Jr. and Ruth before July 10, 2022. (*Id.* at ¶ 75). Plaintiff disputes these allegations and notes that, on bodycam video, Larry Sr. stated Bourbonnais Police have tended to "look the other way" in matters pertaining to Ruth and Larry Jr. (Doc. 67, Resp. ¶ 75).

Sgt. Bertrand spoke to Larry Sr. a few times on the night in question, to try to de-escalate the situation. (Doc. 57, ¶ 76). At or about 11:44 p.m. on July 10, Sgt. Bertrand called Larry Sr. and told him the police were called to Larry Jr.'s house following a report that someone was yelling for help. Bertrand also told him that Larry Jr. shut the garage door and locked the front door, and that the neighbor two doors down said he saw Larry Jr. grab a girl by the hair and drag her into the house. (*Id.* at ¶ 77). Sgt. Bertrand asked Larry Sr. if there was any way he could help him out, if he had a phone number for Larry Jr., or if he could talk sense into Larry Jr. (*Id.* at ¶ 78). Approximately 12 minutes later at 11:56 p.m., Larry Sr. called Sgt. Bertrand and told him Larry Jr. had not been drinking and that Larry Jr. told Larry Sr. he was going to kill himself. (*Id.* at ¶ 79). Plaintiff further notes Larry Sr. told Sgt. Bertrand he believed Larry Jr. would also kill Ruth. (Doc. 67,

Resp. ¶ 79). Larry Sr. told Sgt. Bertrand he could not talk sense into Larry Jr. and that he was on his way over. (Doc. 57, ¶ 80).

At approximately 11:58 p.m., Sgt. Bertrand spoke with Chief Phelps and told Phelps what Larry Sr. had told him. Chief Phelps asked Sgt. Bertrand to ask Larry Sr. if he thought Larry Jr. would hurt Ruth. (*Id.* at ¶ 81). At or about 12:01 a.m. on July 11, 2022, Sgt. Bertrand spoke with Larry Sr. and asked him if he thought Larry Jr. would hurt Ruth. Larry Sr. said that if Larry Jr. was going to do it, he would kill Ruth and then himself. (*Id.* at ¶ 82). At approximately 12:04 a.m., Sgt. Bertrand called Chief Phelps and relayed what Larry Sr. said. Chief Phelps made the decision to back off until the morning for fear of forcing Larry Jr. into doing something. (*Id.* at ¶ 83). Up to this point, the officers had been on scene for approximately 40 minutes, during which time they employed multiple avenues to attempt to verify whether Ruth was safe—they knocked on the residence door, they contacted and tried to speak to Larry Jr. before he closed the door on them, they attempted to see into the house, they called Larry Sr., and called the Chief. (*Id.* at ¶ 84).

To mitigate the situation, Chief Phelps made the decision to de-escalate and leave and not provoke further activity. (*Id.* at ¶ 85). Chief Phelps testified his decision to de-escalate and have the Bourbonnais police officers back off for the evening was based on the safety of everyone involved and not to cause harm to Ruth, Larry Jr., or the officers. (*Id.* at ¶ 86). Defendants contend that, at the time this decision was made to back off and de-escalate, police had been unable to verify that the female in question was Ruth and none of the officers had independent knowledge about whether Ruth was in the residence. (*Id.* at ¶ 87). Plaintiff disputes this assertion based on the information provided

by Hijab, the information conveyed by Larry Sr., and the officers' own observations. (Doc. 67, Resp. ¶¶ 70, 87). After Chief Phelps made the decision, Sgt. Bertrand called Larry Sr. back and advised him of the decision. Larry Sr. stated that "it was probably not a bad idea." (Doc. 57, ¶ 88).

At approximately 12:24 a.m., Sgt. Bertrand, Officer Garcia, and Officer Cavender met in a parking lot to discuss the situation after leaving the residence. (*Id.* at ¶ 89). Larry Sr. was driving to Larry Jr.'s house, saw the officers' cars, and pulled into the parking lot to speak with them. (*Id.* at ¶ 90). While in the parking lot, Larry Sr. mentioned there was a restraining order, that he feared Larry Jr. did something to Ruth because Ruth is very loud, and Larry Sr. did not hear Ruth when he talked to Larry Jr. (*Id.* at ¶ 91). Larry Sr. stated that every time he asked Larry Jr. about Ruth, Larry Jr. would not respond to him. (*Id.* at ¶ 92). Chief Phelps testified he did not know there was an order of protection when the decision to back off and not take any further action was made. (*Id.* at ¶ 93). In response, Plaintiffs contend Chief Phelps is either lying about his lack of knowledge or should have known about the order of protection based on information that was available to him. (Doc. 67, Resp. ¶ 93). Sgt. Bertrand testified he did not call Chief Phelps to inform him about the order of protection because Phelps had already made the decision to deescalate and leave and Bertrand did not believe there was probable cause to enter the Menz home. (Doc. 57, ¶ 94). Chief Phelps testified that, based on the information he had on the night of July 10, 2022, he believed a forceful entry could have violated Larry Jr.'s Fourth Amendment rights. (*Id.* at ¶ 95).

After Larry Jr. did not report to work on July 11, 2022, officers were dispatched to the Menz residence for a welfare check. Chief Phelps made the decision to contact the emergency response team. (*Id.* at ¶ 96). Upon entry into the home, the emergency response team discovered the bodies of Larry Jr. and Ruth, both deceased. Larry Jr. and Ruth both died from gunshot wounds at their home on either July 10 or 11, 2022. (*Id.* at ¶ 97). The deaths were determined to be a murder-suicide. (*Id.* at ¶ 98).

## II. DISCUSSION

Ten counts remain of Plaintiff's eleven-count Complaint.[2] 3While Plaintiff acknowledges there are genuine issues of material fact as to damages, Plaintiff argues summary judgment as to liability is appropriate on Counts I, III, IV, V, VI, VIII, IX, and X because Defendants failed to do what was required of them under Illinois law, their own policies, and their training guidelines.

Defendants proffer several reasons as to why they are entitled to summary judgment. First, Defendants assert the discretionary nature of the Illinois Domestic Violence Act defeats Plaintiff's claim of a due process violation asserted in Counts I and IX. Summary judgment is warranted on the class-of-one equal protection claims in Count X because (1) there is no evidence Defendants acted out of a totally illegitimate animus; and (2) contacting Larry Sr. instead of arresting Larry Jr. was a rational exercise of government authority. Defendants also argue the officers are also entitled to qualified

---

[2] Plaintiffs voluntarily dismissed Count II which asserted a failure to intervene claim. (*See* Minute Entry of Aug. 15, 2023; Doc. 30 at 6, n.2).

immunity as to the due process and equal protection claims and the Village of Bourbonnais is entitled to summary judgment on Plaintiff's *Monell* and equal protection claims.

**A. Legal Standard**

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit, and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Biggs v. Chic. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023) (internal quotation marks and citation omitted). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Systems*, 936 F.3d at 579 (internal quotation marks omitted).

**B. Procedural Due Process Claims**

To properly allege a procedural due process claim, a plaintiff must establish: "(1) a deprivation of a protected liberty or property interest; and (2) the deprivation occurred without due process." *Smith v. Garland*, 103 F.4th 1244, 1255-56 (7th Cir. 2024). "A

statutorily conferred, nondiscretionary benefit may be a protected property or liberty interest." *Id.* (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (noting that a liberty or property interest is "created" and "defined by existing rules or understandings that stem from an independent source such as state law" but "is not a protected entitlement if government officials may grant or deny it in their discretion.")). The issue in *Smith* concerned the process due to a noncitizen who had filed an application for special immigrant status as the surviving spouse of a United States citizen. *Id.* at 1254-56.

In *Castle Rock*, the Supreme Court considered "whether an individual who has obtained a state-law restraining order has a constitutionally protected property interest in having the police enforce the restraining order when they have probable cause to believe it has been violated." 545 U.S. at 750-51. The complainant obtained a restraining order commanding her husband not to "molest or disturb the peace of [complainant] or of any child," and to stay at least 100 yards from the family home. *Id.* at 751. The restraining order included preprinted notices to the parties and to law enforcement officials. *Id.* Approximately one month after the restraining order was obtained and three weeks after it was made permanent, the husband kidnapped and murdered his three daughters. *Id.* at 752-54. On the night that the children were reported missing, the complainant contacted police by telephone at least three times and submitted an incident report at the police station. *Id.* at 753-54. The officers made no effort to enforce the restraining order or locate the three children. *Id.* The Court in *Castle Rock* held that the complainant did not, "under the Due Process Clause, have a property interest in police

enforcement of the restraining order against her husband." *Id.* at 768. The Court concluded:

> In light of today's decision and that in *DeShaney*, the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations. The result reflects our continuing reluctance to treat the Fourteenth Amendment as "a font of tort law," but it does not mean States are powerless to provide victims with personally enforceable remedies. Although the Framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have prevented, the people of Colorado are free to craft such a system under state law.

*Id.* at 768-69 (internal citations omitted).

Applying *Castle Rock*, the Seventh Circuit in *Wilson-Trattner v. Campbell*, 863 F.3d 589 (7th Cir. 2017), observed that the Supreme Court "held that there is no due process right to have another arrested for one's own protection." *Id.* at 595 (citation omitted). "The Court found that [the facts of *Castle Rock*] did not give rise to a procedural due process claim, as the plaintiff had no property right in the enforcement of the restraining order." *Id.*

In its Order denying Defendants' Motion to Dismiss in most respects, the Court found that Plaintiff's allegations were sufficient to allege a cognizable procedural due process claim under 42 U.S.C. § 1983. In making this determination, the Court determined that certain language in the Illinois Domestic Violence Act distinguished this case from *Castle Rock*. Specifically, the Illinois Domestic Violence Act provides that the law enforcement officer "shall immediately use all reasonable means to prevent further

abuse, neglect, or exploitation," while the Colorado statute at issue in *Castle Rock* provided, "A peace officer shall use every reasonable means to enforce a restraining order." (Doc. 30). This Court determined that the use of the word "immediately" constituted a "stronger indication" of mandatory language that indicated Illinois had instituted a protected liberty interest sufficient to assert a procedural due process claim. (*Id.* at 19-20).

The parties have now engaged in discovery, and the matter is before the Court at summary judgment. The Court has taken a fresh look at *Castle Rock* and now finds, after viewing the evidence and construing all inferences in favor of Plaintiffs, that there is no genuine factual dispute on Plaintiff's procedural due process claims and Defendants are entitled to judgment as a matter of law on those claims asserted in Counts I and IX. In *Caste Rock*, the Supreme Court stated, "Even if we were to think otherwise concerning the creation of an entitlement by Colorado, it is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause." *Castle Rock*, 545 U.S. at 761, 766. ("It is hard to imagine that a Colorado peace officer would not have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.").

The Supreme Court concluded by stating that any benefit a third party might receive "from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive'

manifestations." *Id.* at 768. The Seventh Circuit has also observed that the police's refusal to enforce the protective order in *Castle Rock* and the husband's subsequent murder of the children "did not give rise to a procedural due process claim, as the plaintiff had no property right in the enforcement of the restraining order." *Wilson-Trattner*, 863 F.3d at 595. Because the Supreme Court and Seventh Circuit have not recognized a property right in the enforcement of restraining order under similar circumstnaces, this Court cannot do so. Based on the foregoing, Defendants are entitled to summary judgment on Plaintiffs' procedural due process claims asserted in Counts I and IX.[4]

**C. Equal Protection Claim**

Plaintiff's equal protection claim in Count X is a "class-of-one" claim that is premised on "the preferential treatment given to Larry Menz and Larry Sr. on account of his relationship with the Village," which resulted in the "willful and wanton disregard

---

[4]The individual Defendants would also be entitled to summary judgment based on qualified immunity. When a defendant invokes qualified immunity in seeking summary judgment, the plaintiff bears the burden of demonstrating that the defendant violated a constitutional right and that the constitutional right was clearly established, such that "a reasonable official would understand that what he is doing violates that right." *Mabes v. Thompson*, 136 F.4th 697, 705 (7th Cir. 2025) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "clearly established" inquiry must be "particularized" to the facts of the case. *Id.* (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)). The court must focus on each claim and "determine whether *each* defendant violated [Plaintiff's] rights and, if so, whether that right defined at an appropriate level of specificity, was clearly established at the time." *Id.* at 706 (emphasis in original). It does not appear that any other federal court has held that a police officer's failure to act under the Illinois Domestic Violence Act constitutes a violation of due process that is cognizable under § 1983. Based on the controlling authority of *Castle Rock* and *Wilson-Trattner*, a reasonable police officer would have no basis to believe he was violating Ruth Menz's procedural due process rights based on the facts of this case.

for Ruth's safety on account of accommodating Larry's father," leading to her death. (Doc. 1, ¶¶ 127-129).

For a plaintiff to prevail on class-of-one equal protection claim, she must typically show that defendants' actions "lacked any conceivable rational basis," which is a "heavy lift." *Greenwald Family Ltd. Partnership v. Mukwonago*, 100 F.4th 814, 817 (7th Cir. 2024). In *Hilton v. City of Wheeling*, 209 F.3d 1005 (7th Cir. 2000), the Seventh Circuit recognized that a claim of unequal police protection could constitute a violation of the Equal Protection Clause. *Id.* at 1007. For example, "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Id.* The withdrawal of police protection for an individual out of "sheer malice" or because the police had been bribed would also be an equal protection violation. *Id.* "If a merely unexplained difference in police treatment of similar complaints made by different people established a prima facie case of denial of equal protection of the laws, the federal courts would be drawn deep into the local enforcement of petty and state local laws." *Id.* at 1008. Thus, the plaintiff must show that that difference in treatment was based on a "totally illegitimate animus toward the plaintiff by the defendant." *Id.* (citation omitted).

The Seventh Circuit later observed "that some more recent cases have cast doubt on the animus requirement, suggesting that the plaintiff need only show that no rational reason supports the unequal treatment." *Hanes v. Zurick*, 578 F.3d 491, 494 (7th Cir. 2009) (citing *United States v. Moore*, 543 F.3d 891, 898 (7th Cir. 2008)). In *Frederickson v. Landeros*, 943 F.3d 1054 (7th Cir. 2019), the Seventh Circuit noted it has "not definitively resolved

the question whether it is sufficient for a plaintiff to simply allege a differential treatment at the hands of the police with no rational basis, or if a class-of-one claim requires a plaintiff *additionally* to prove that the police acted for reasons of personal animus, malice, or some other improper personal motivation." *Id.* at 1061. (clearly established). Unlike *Hilton*, neither *Hanes* nor *Frederickson* involved the withdrawal of police protection. In *Hanes*, the plaintiff's claim was based on selective enforcement of the law because, whenever plaintiff or his neighbors called police about a long-running dispute, it was always plaintiff and not his neighbors that was arrested. *Hanes*, 578 F.3d at 492. In *Frederickson*, the plaintiff's class-of-one claim was premised on plaintiff's assertion that the police officer "prevented him from updating his Illinois sexual offender registration and otherwise used his official position to harass Frederickson purely out of personal dislike." *Frederickson*, 943 F.3d at 1056.

Because the Seventh Circuit has not departed from the "illegitimate animus" standard of *Hilton* in the context of withdrawal of police services equal protection claims, the Court will apply that standard.[5] Applying that standard, Plaintiff cannot show that Defendants deliberately sought to deprive Ruth Menz of the equal protection of the laws for reasons of a personal nature. No evidence in the record shows that the Defendant police officers or the Village of Bourbonnais harbored any animus toward Ruth. As

---

[5]Even assuming a lesser standard applied, the individual Defendants would be entitled to qualified immunity because only the higher standard is clearly established in the Seventh Circuit. *See Frederickson*, 943 F.3d at 1062 ("We accept . . . that the only form of class-of-one equal protection right that is *clearly* established within our circuit involves government actors who single out a citizen for differential treatment with no objective rational basis for that difference *and* because of a 'vindictive or harassing purpose.'").

Defendants note, several of the officers knew Ruth and Larry Jr. from previous encounters. These prior encounters evince a lack of animus toward Ruth because Larry Jr. was arrested on multiple occasions—even once when Ruth refused to sign a complaint against him. In contacting Larry Sr. and attempting to deescalate the situation, the police officers chose a course that can now be second-guessed but it was a rational choice. Thus, Defendants are entitled to summary judgment on Plaintiff's class-of-one equal protection claim.

**D. *Monell* Custom Policy and Practice Claim**

In Count III, Plaintiff asserts a claim against Defendant Village of Bourbonnais under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), wherein the Supreme Court concluded that municipalities and other local government entities can be liable under § 1983 when a policy or custom of the municipal entity caused a constitutional deprivation. *Id.* at 690-91. For *Monell* liability to attach, the constitutional violations must result from: (1) an express policy; (2) a widespread custom or practice; or (3) a decision by an agent with final policymaking authority. *Dean v. Wexford Health Sources*, 18 F.4th 214, 235 (7th Cir. 2021). "[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) (citation omitted). Because there is no underlying constitutional violation by any of the individual Defendants, the Village of Bourbonnais is entitled to summary judgment on Plaintiff's *Monell* claims.

**E. State Law Claims**

In addition to the § 1983 claims, Plaintiff's Complaint includes several state law claims. The normal practice within the Seventh Circuit is that, if all federal claims are dismissed before trial, the district court should relinquish jurisdiction over any supplemental state law claims "in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see also* 28 U.S.C. Sec 1367(c)(3). The Court finds no basis to depart from that general practice and will dismiss Plaintiff's state law claims without prejudice.

## III. CONCLUSION

Like *Castle Rock*, which involved the murder of three children by the children's father who was violating the terms of a restraining order, the facts of this case are horrific. The Supreme Court recognized that, while the plaintiff might have viable state law remedies, her federal claims could not proceed because of "our continuing reluctance to treat the Fourteenth Amendment as a font of tort law." *Castle Rock*, 545 U.S. at 768 (internal quotation marks and citation omitted). The reasoning in *Castle Rock* leads this Court to the same result. "Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have prevented, the people of Colorado are free to craft such a system under state law." *Id.* at 768-69. The people of Illinois are also free to craft such a system and Plaintiff may proceed in state court on her state law claims.

Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 56) is DENIED and Defendants' Motion for Summary Judgment (Doc. 57) is GRANTED. Because amendment of the Complaint would be futile as to the federal claims, Counts I, III, IX, and X are Dismissed with Prejudice. The Court relinquishes jurisdiction over the remaining state law claims, which are Dismissed without Prejudice. The Clerk will enter judgment and terminate this case.

ENTER: September 23, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE